**Susan HILDEBRAND, Plaintiff,**

v.

**William HILDEBRAND, M.D.,
Defendant.**

**No. IP 89–159–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 7, 1990.

Joseph I. Cronin, Minden, Nev., and Gayle M. Phelps and Thomas A. Fara, Indianapolis, Ind., for plaintiff.

Gil I. Berry, Jr., Buck, Berry, Landau & Breunig, Indianapolis, Ind., for defendant.

## ENTRY

BARKER, District Judge.

On March 8, 1989, plaintiff Susan Hildebrand ("Susan") filed a four-Count Amended Complaint against her father, Dr. William Hildebrand ("Hildebrand"), alleging that he physically and sexually abused her when she was a minor. In his Answer, Hildebrand denies the allegations, and pleads as an affirmative defense that Susan's allegations, even if true, are barred by Indiana's two-year statute of limitations for personal injuries.

On April 12, 1990, the court heard oral argument on the case, during which the plaintiff conceded that her claims in Count I for assault and battery were time-barred, and agreed to merge the Count III claim for punitive damages with the Count II claim for emotional distress. In addition, the plaintiff has charged her father with parental negligence in Count IV. The matter is currently before the court of the defendant's Motion for Summary Judgment.

The legal standard governing summary judgment is familiar: summary judgment shall be entered if

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Rule 56 is designed to go beyond the pleadings to determine whether genuine issues of material fact exist. A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Puckett v. Soo Line Railroad Co.*, 897 F.2d 1423 (7th Cir.1990). Doubts about the sufficiency are resolved in favor of the nonmovant, *Rodeo v. Gillman*, 787 F.2d 1175, 1177 (7th Cir.1986), and all justifiable inferences are drawn in favor of the nonmovant. *Anderson v. Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513; *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir.1988).

## FACTUAL ALLEGATIONS

Mr. Hildebrand concedes, for the purposes of his Motion, the factual allegations contained in Susan's complaint. Susan alleges that her father physically and sexually abused her from 1968, when she was five years old, until 1979, when she was a senior in high school. The episodes of physical abuse began in 1968, and were often triggered by Susan's failure to measure up to her father's expectations. These "failures," ranging from coloring outside the lines of a coloring book to not understanding her father's explanations to homework problems, provoked her father to beat Susan with a ping-pong paddle (which broke when Susan was eleven years old) or a leather belt. Susan further alleges that her father systematically beat her for getting unsatisfactory grades at

school.[1] Susan also relates that the defendant struck her in the face with his fist on numerous occasions.

The alleged sexual abuse began when Susan was thirteen or fourteen years old. Susan asserts that her father accosted her "almost continuously" to fondle her breasts and genitals, and further alleges weekly episodes of more severe sexual conduct, the details of which it is unnecessary to recount.[2] The abuse continued until Susan was seventeen years old, when she no longer lived at home.

Susan acknowledges that she suffered from depression during her adolescence, and she now attributes that depression to the abuse she was subjected to. When Susan was still a minor, Dr. Hildebrand allegedly diagnosed her as having "a chemical imbalance in the brain," and medicated her with anti-depressants.[3] Susan believed that her father's diagnosis of her depression was correct.

The last alleged act of abuse happened in November of 1979, when the plaintiff was seventeen. Following an argument at the breakfast table, Dr. Hildebrand allegedly knocked the food and dishes off the table, and "struck [Susan] violently across the face and neck causing [her] head to strike a wall." [4] Later that morning, Susan's teacher discovered a "lump" on Susan's head, and "the proper authorities were contacted." [5] After telling a police detective about the physical and sexual abuse, Susan was placed in a guardian's home for two weeks, and from there went to live with Mr. and Mrs. Vehorn. The Vehorns were friends of the Hildebrands, and Susan stayed with them until April or May of 1980.

This violent episode precipitated the first psychological counseling Susan ever received.[6] Although the record is not clear on this point, it seems that a counsellor—Ms. Linda Ferreira—was assigned to the Hildebrands, and Susan met with Ms. Ferreira individually, and in joint sessions with her parents, on a weekly basis until Susan went away to college in August of 1980. The plaintiff did not discuss the alleged episodes of physical and sexual abuse with Ms. Ferreira, but assumed that Ms. Ferreira had materials on file which detailed those episodes.

In August of 1980 Susan left Indianapolis to attend college at Indiana University in Bloomington. Susan met a young woman named Cara Woods during her freshman year, to whom she confided that her father had physically and sexually abused her. Although Susan did not provide details of the abuse, she and Ms. Woods did discuss the "emotional aspects of our lives." [7] Susan was experiencing depression and low self-esteem, so she sought professional help, and in September began to see Dr. Nicolitti on a weekly basis. By December of 1980, this counseling had made little progress, so Susan contacted Ms. Ferreira who referred her to the Psychological Services at Indiana University. There she was first treated by Mary Kelly, and afterwards by Kelly's supervisor, Dwight Noble. This counseling lasted until the end of the school year, when Susan returned to Indianapolis for the summer.

1. "[M]y father had determined a system whereby I should have so many strokes with the belt for certain grades. I don't know if it was seven with a C...." Deposition of Susan Elaine Hildebrand Wagers ("Deposition") p. 29.

2. Deposition, p. 104. *See also* Plaintiff's Answers to Defendant's Interrogatories ("Interrogatory") p. 20.

3. Affidavit of Susan Hildebrand Wagers (attached to Plaintiff's Opposition to Defendant's Motion for Summary Judgment), p. 2. Susan also alleges that her father sent anti-depressant drugs to her "around Christmas time" in 1984. Deposition, p. 95.

4. Depositon, pp. 49–50; Interrogatory, pp. 16–17.

5. Deposition, p. 68.

6. The counsellor was not, however, the first person Susan had ever spoken with about the abuse. Aside from the police detective mentioned above, Susan had spoken about the episodes she had with her father to Mrs. Vehorn. Mrs. Vehorn comforted Susan, and reassured her that she "was a good kid." Deposition, p. 72.

7. Deposition, p. 53.

Susan did not live with her parents in the summer of 1981 because she "did not wish to be a part of that environment."[8] At that time Susan again met with Ms. Ferreira for counseling. Upon returning to school in the fall of 1981, Susan resumed counseling with Mr. Noble about her depression and her relationship with her parents. This counseling lasted until May of 1982, and recommenced in the fall of 1982 when Susan returned to Bloomington again. Susan met with Mr. Noble until the spring of 1983.

During Susan's third year at college her depression became disabling, and she felt too depressed to get out of bed. Consequently her grades that year "were awful"[9] and she did not return to school the next year. Susan spent the following summer in Florida, where she consulted a psychologist named Jim Bratt to help her deal with her depression and sense of worthlessness, which had been exacerbated by a recently contracted case of herpes. Susan also felt that her depression had led her to engage in "inappropriate" sexual behavior.[10] She continued to meet with Mr. Bratt until August of 1983, and that November she moved to Decatur, Illinois. From the winter of 1983 until the summer of 1984,[11] Susan met with psychologist Sarah Schilawski to receive counseling on her depression.

Susan moved to Boulder City, Nevada in September of 1984, and the following January began to get counseling from a psychologist named Robert Taylor. Susan testified that she was still combatting the same feelings of depression, although as she grew older her feelings "would change slightly with my place in life and what issues I was faced with at that time."[12] Susan continued to meet with Mr. Taylor until October of 1985, when she moved to California. In June of 1986 Susan began participating in group counseling for people with problems in their sexual relationships. This counseling was managed by a psychologist named Noel Lande, and was discontinued when Susan moved to Las Vegas in February of 1987.

In March of 1987, Susan first met a psychologist named Evelyn Hall. Susan enjoyed a better therapeutic relationship with Ms. Hall than she had with her previous psychologists, and it was at their first session that Ms. Hall told Susan that Susan was suffering from "post-traumatic stress disorder." Susan met with Ms. Hall once a week for one and a half to two years, and still meets with her on occasion. It was not until her first session with Ms. Hall, on March 9, 1987, that Susan for the first time connected her depression with the sexual and physical abuse she had sustained during childhood.[13] Susan brought suit against her father within two years after making this connection.

## DISCUSSION

The question before this court is whether the plaintiff's action is barred by the statute of limitations. The court recognizes that incest and sexual abuse are major social problems in today's society. *See* National Legal Resource Center for Child Advocacy and Protection, *Child Sexual Abuse: Legal Issues and Approaches*, (rev. ed. 1981). When legal issues involve such sensitive, volatile areas, it is particularly important for courts not to let the emotional impact of the alleged facts obscure the applicable legal principles.

■ In diversity suits, a federal court must apply the substantive law of the forum in which it sits, including the forum state's statutes of limitations. *Walker v. Armco Steel Corp.*, 446 U.S. 740, 745, 100 S.Ct. 1978, 1982–83, 64 L.Ed.2d 659 (1980); *Guaranty Trust Co. v. York*, 326 U.S. 99,

---

8. Deposition, p. 65.

9. Deposition, p. 48.

10. Deposition, p. 88.

11. Interrogatory, p. 7. Susan's response actually reads, "Winter of 1984 through Summer of 1984," but as time does not go backwards, the court assumes that Susan intended to say "Winter of 1983 through Summer of 1984."

12. Deposition, p. 93.

13. Deposition, p. 115; Affidavit of Susan Hildebrand Wagers, pp. 1–2.

109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079 (1945); *Anabaldi v. Sunbeam Corp.*, 651 F.Supp. 1343, 1344 (N.D.Ill.1987). Therefore this court looks to Indiana's statutes of limitation and the case law interpreting them to resolve the present controversy.

Indiana courts view statutes of limitation favorably, recognizing that while such statutes occasionally work an injustice, they "rest upon sound policy, and tend to the peace and welfare of society". *Shideler v. Dwyer*, 275 Ind. 270, 417 N.E.2d 281, 291 (1981) (quoting *Craven v. Craven*, 181 Ind. 553, 103 N.E. 333, 335 (1913)). It is well within the legislature's prerogative to protect defendants from stale claims by prescribing a reasonable period within which actions must be brought. *St. Joseph County v. Wilmes*, 428 N.E.2d 103 (Ind.Ct. App.1981). *See also Spoljaric v. Pangan*, 466 N.E.2d 37, 43 (Ind.Ct.App.1984); *Kemper v. Warren Petroleum Corp., Inc.*, 451 N.E.2d 1115, 1117 (Ind.Ct.App.1983); *Matter of M. D. H.*, 437 N.E.2d 119 (Ind.Ct. App.1982). Summary judgment is particularly apposite when the defense is based on a statute of limitations. *Shideler v. Dwyer*, 417 N.E.2d at 294.

Susan Hildebrand alleges that she has been injured by her father's intentional infliction of emotional distress and by his negligent failure to exercise reasonable care toward her while she was a minor.[14] The applicable statute of limitation for these causes of action is Ind.Code § 34–1–2–2, which affords plaintiffs two years "after the cause of action has accrued" to sue for "injuries to person or character". The Indiana Supreme Court has noted that while the legislature specified the time within which an action must be brought, the legislature also "left to the courts the responsibility of determining when the cause accrues." *Burks v. Rushmore*, 534 N.E.2d 1101, 1103 (Ind.1989); *see also Covalt v. Carey Canada, Inc.*, 543 N.E.2d 382, 384 (Ind.1989); *Barnes v. A.H. Robins Co., Inc.*, 476 N.E.2d 84, 86–87 (Ind. 1985).

A statute of limitation will not begin running until a cause of action accrues. In *Burks v. Rushmore*, the Indiana Supreme Court noted that while intermediate appellate courts had applied a variety of formulas, the "general rule" is that a cause of action accrues "when resultant damage [is] ascertained or [is] ascertainable by due diligence." 534 N.E.2d at 1104; *see also Barnes*, 476 N.E.2d at 86.[15] The *Burks* court considered, but declined to adopt, a rule whereby a cause of action would accrue immediately upon the wrongful act occurring. 534 N.E.2d at 1103 (discussing *Guy v. Schuldt*, 236 Ind. 101, 138 N.E.2d 891, 895 (1956), *Montgomery v. Crum*, 199 Ind. 660, 161 N.E. 251 (1928), and *Craven v. Craven*, 181 Ind. 553, 103 N.E. 333 (1913)). Therefore it is the time that damage is or could be ascertained, not the time the wrongful act transpired, that controls the analysis.[16]

---

14. The court construes the Count IV negligence claim as seeking relief for negligent failure to exercise due care with respect to Susan's emotional injuries; these injuries are essentially emotional, like those of Count II. The failure to exercise due care with respect to the alleged physical abuse would be time-barred, like the plaintiff's attorney conceded the assault and battery claim to be.

15. "There would be no point in recounting all of the cases considered by this Court and the Court of Appeals involving [the question of when statutes of limitation commence] except to note that the key to the solution in all of them was the ascertainability of the damage within the statutory time."

16. As a preliminary matter, this court notes that Susan was a minor when the complained of acts occurred, and thus was "under a legal disability." The Indiana Code provides that persons who are under legal disabilities when their cause of action accrued may bring suit within two years after the disability is removed. Ind. Code § 34–1–2–5. The term "legal disability" includes persons under the age of eighteen. Ind.Code § 34–1–67–1(6). The Indiana legislature lowered the age of legal disability from twenty-one to eighteen, effective as of July 26, 1973.

Indiana courts apply the law existing at the time the alleged injury occurred. *McClain v. Chavez*, 178 Ind.App. 560, 383 N.E.2d 414, 415 (1978). This approach is problematic in the present case because the acts giving rise to the plaintiff's claims allegedly occurred between 1968 and 1979, a period that spans the different rules. Further, it is impossible to apportion the emotional distress suffered into pre and post

■ The plaintiff argues that the nature of the harm she suffered merits application of the "discovery rule." The discovery rule is:

> based on the reasoning that it is inconsistent with our system of jurisprudence to require a claimant to bring his cause of action in a limited period in which, even with due diligence, he could not be aware a cause of action exists.

*Barnes v. A.H. Robins*, 476 N.E.2d 84, 86 (Ind.1985). Under this rule, a cause of action accrues, and thus the statute of limitation commences, when a plaintiff "knew or should have discovered" that she (1) suffered an injury or impingement, and (2) that the injury or impingement was caused by the product or act of another. *Id.* at 86–87. Thus, "the Indiana discovery rule has both an injury and a causation prong." *Evenson v. Osmose Wood Preserving Co. of America, Inc.*, 899 F.2d 701, 703 (7th Cir.1990).

The court pauses to note that at first glance, the differences between Indiana's "general rule" and the "discovery rule" seem semantic rather than substantive. The general rule dictates that a cause of action accrues when the harm suffered is "ascertained or ascertainable by due diligence." Under the discovery rule, a cause of action accrues when a plaintiff "knew or should have discovered" that she was harmed. "Ascertained" and "knew" both import actual knowledge of the harm, and "ascertainable" and "discoverable" are synonymous. *See* Webster's Third New International Dictionary (unabridged), G. & C. Merriam Co., 1966, pp. 126 (definition of "ascertain") and 647 (definition of "discover"). What separates these two rules is the causality prong of the discovery rule. In some factual situations, a plaintiff may be well aware that she suffers from some malady, but have no knowledge that the harm was caused by the product or act of another person. Such situations are distinct from typical tort claims, where "the injury occurs at the time the negligent act is done and the claimant is either aware of the injury, *or at least the cause of the injury,* and is put on notice to determine the extent of that injury." *Barnes*, 476 N.E.2d at 86 (emphasis added). Where there is no reasonable possibility that a plaintiff could know that her ailment is caused by another's wrongful behavior, the discovery rule goes beyond the general rule in tolling the statute of limitation despite her knowledge of her injury.[17]

■ The Indiana Supreme Court has expressly declined to apply the discovery rule to all tort claims, *Barnes*, 476 N.E.2d at 87, and has employed the rule only in cases where "an injury to a plaintiff is caused by a disease which may have been contracted as a result of a protracted exposure to a foreign substance." *Covalt v. Carey Canada, Inc.*, 543 N.E.2d 382, 384 (Ind.1989) (exposure to asbestos); *Barnes*, 476 N.E.2d at 87 (exposure to a Dalkon Shield). Despite the extremely narrow holdings in those cases, however, the Court has not suggested "that the discovery rule [is] necessarily inappropriate in other contexts." *Burks v. Rushmore*, 534 N.E.2d 1101, 1104 (Ind.1989). Thus the Supreme Court appears to have left the door open for applying the discovery rule on a case-by-case basis.

In *Burks v. Rushmore* an Indiana appellate court applied the discovery rule in a defamation case. The court noted that the rule would not have been applicable if the defamation had been perpetrated through

---

1973 segments. This court need not resolve the issue, however, because even if Susan was under a disability until she became twenty-one years old (September 23, 1983) (assuming her causes of action accrued before then), she did not bring suit until February of 1989, more than three and a half years after the two year grace period provided by Ind.Code § 34–1–2–5 elapsed.

**17.** The Seventh Circuit, applying Indiana law, has stated that "where knowledge of causation is at issue, a person knows or should have discovered the cause of his injury when he has or should have discovered some evidence that there was a reasonable possibility that his injury was caused by the act or product of another." *Evenson v. Osmose Wood Preserving Co. of America, Inc.*, 899 F.2d 701, 705 (7th Cir.1990). That court further noted that this inquiry is "fact-specific," but that "a plaintiff's mere suspicion or speculation" concerning the causality of his injury is insufficient to trigger a statute of limitation under the discovery rule. *Id.* at 705.

the mass media, because then there would have been no attempt to conceal the publication from the defendant, and the defamatory material would have been readily discoverable. 499 N.E.2d 762, 764 (Ind.Ct. App.1986). In *Burks,* however, the defamation occurred in a confidential memorandum, and the plaintiff had no opportunity to discover it. On transfer, the Indiana Supreme Court did not squarely address the issue of whether the discovery rule was applicable. The Supreme Court agreed with the appellate court that the trial court's grant of summary judgment (based on a statute of limitation defense) should be reversed, but the Court vacated the appellate court's opinion. Although the Supreme Court noted that the discovery rule may be applicable in situations other than exposure to foreign substances, the Court did not apply the discovery rule. Instead, it applied the "general rule" that statutes of limitation commence when the actionable damage is ascertained or ascertainable. 534 N.E.2d at 1104–1105. The Indiana Supreme Court did not explain why it vacated the appellate court's opinion, but the effect was to erase the application of the discovery rule in concealed defamation cases. Thus it does not appear that the Indiana Supreme Court endorsed the appellate court's extension of the discovery rule in that case.

Even more recently, an Indiana appellate court applied the discovery rule to an abuse of process case. *Groen v. Elkins,* 551 N.E.2d 876 (Ind.Ct.App.1990). That court reasoned that because the plaintiff had not been put on notice that his legal rights had been impinged upon (entry of default judgment after insufficient service of process), his cause of action did not accrue until he "actually knew or reasonably should have discovered" the injury to his legally protected interest. *Id.*

The Indiana Supreme Court has not directly ruled on whether the discovery rule should apply to actions for emotional distress and negligent care, where the harm stems from the alleged physical and sexual abuse of a minor by a parent. Consequently this court must ascertain how the Indiana Supreme Court would decide the issue, and may look to intermediate appellate state court decisions for guidance. *First Comics, Inc. v. World Color Press, Inc.,* 884 F.2d 1033, 1038 (7th Cir.1989); *Peeler v. Village of Kingston Mines,* 862 F.2d 135 (7th Cir.1988) (citing *Hicks v. Feiock,* 485 U.S. 624, 108 S.Ct. 1423, 1428–29 n. 3, 99 L.Ed.2d 721 (1988)).

Few courts in the country have addressed the issue of whether to use a discovery rule to toll a statute of limitations so as to allow adults to bring incest claims against their abusers. Many of the cases that have addressed the issue are discussed in a thoughtful opinion by Judge Plunkett in *Johnson v. Johnson,* 701 F.Supp. 1363 (N.D.Ill.1988). The cases usually pose one of two fact patterns: (1) situations where the plaintiff knew she had been abused, but did not know that other psychological problems were caused by the abuse, and (2) situations where the traumatic effect of the abuse completely suppressed recollection or knowledge that the abuse had occurred until some other event, such as therapy, triggered the memory. *Id.* at 1367. In the present case, Susan's claims approximate a "Type 1" claim.[18]

Courts in California and Montana have refused to apply the discovery rule in "Type 1" cases. In both cases, the plaintiffs knew that they had been sexually abused by a relative and that they suffered from psychological probelems, but they had not seen the causal relationship until after the statute of limitations had run. The California court reasoned that the discovery rule should not apply because the plaintiff suffered cognizable harm at the time she was abused. *DeRose v. Carswell,* 196 Cal.App.3d 1011, 242 Cal.Rptr. 368, 373 (6th Dist.1987). The Montana court also

---

**18.** At oral argument the plaintiff's counsel contended that cases should not be fit into defined categories, because such pidgeon-holing obscures the unique facts of each case. The court has no intention of corralling Susan's case into a ready-made framework; nevertheless, the distinction drawn by Judge Plunkett is useful in comparing this case with decisions from other jurisdictions.

focused on the plaintiff's knowledge that she had been assaulted, and ruled that her "failure to understand her legal rights did not save her claim":

> To allow a plaintiff, who fails to inquire into the cause of an injury, to avoid the time bar under the guise of 'discovery' would hopelessly demolish the protection afforded defendants by the statute.

*E.W. v. D.C.H.*, 231 Mont. 481, 754 P.2d 817, 820 (1988) (quoting *Much v. Sturm, Ruger & Co., Inc.*, 502 F.Supp. 743, 745–746 (D.Mont.1980).

On the other hand, courts in Wisconsin and North Dakota have applied the discovery rule in Type 1 cases. *See Hammer v. Hammer*, 142 Wis.2d 257, 418 N.W.2d 23 (App.1987) [19]; *Osland v. Osland*, 442 N.W.2d 907 (N.D.1989). In *Hammer* the plaintiff alleged that as a result of her denial and repression mechanisms (normal post-traumatic stress reactions), she had not known that the sexual abuse her father subjected her to had caused any psychological damage. The Wisconsin court concluded that the discovery rule tolled the statute of limitations until the plaintiff could reasonably have discovered both the fact and the cause of her injury. Similarly, the Supreme Court of North Dakota ruled that the "severe emotional trauma" that accompanies incestual sexual abuse justified tolling the statute of limitations, because the plaintiff was "unable to fully understand or discover her cause of action during the applicable statutory limitations period." *Osland*, 442 N.W.2d at 909.

In Type 2 cases, courts in California and Michigan have applied the discovery rule where the plaintiff had repressed all memories of the abusive events until some other event triggered recall. *Mary D. v. John D.*, 216 Cal.App.3d 285, 264 Cal.Rptr. 633, 639 (6th Dist.1989); *Meiers-Post v. Schaf-er*, 170 Mich.App. 174, 427 N.W.2d 606, 606 (1988). Judge Plunkett held that Illinois courts would also apply the discovery rule in Type 2 situations. *Johnson v. Johnson, supra.* Conversely, a Florida court held that the discovery rule is not applicable even when a plaintiff has repressed all memories that her father had sexually abused her. *Lindabury v. Lindabury*, 552 So.2d 1117 (Fla.App. 3 Dist.1989). The Supreme Court of Washington had also held that the discovery rule would not apply to either Type 1 or Type 2 cases, *Tyson v. Tyson*, 107 Wash.2d 72, 727 P.2d 226 (1986), but that decision was superceded by a statute requiring that the discovery rule be used.[20]

Many of the courts cited above expressed concern that, the plaintiff having waited so long to file suit, there would be no objective evidence available to verify the plaintiffs claims. *Cf. Tyson v. Tyson*, 727 P.2d at 227–229; *but see Osland v. Osland*, 442 N.W.2d at 909. In the present case, however, there are ample "objective" indicia available to bolster Susan's claim. Moreover, such evidentiary matters ought not be resolved against a plaintiff on summary judgment.

The factual allegations in the present case, though unique, are analogous to the Type 1 cases discussed above. As in those cases, Susan has always known that her father physically and sexually abused her, but she did not know until her therapy with Ms. Hall that her psychological problems were caused by that abuse. Although neither the California nor the Montana court applied the discovery rule to Type 1 situations, those cases cannot govern the present analysis. Those courts focused on the plaintiff's knowledge that the abusive acts had occurred, and discounted the plaintiff's inability to identify those acts as hav-

---

**19.** It should be noted, however, that the Wisconsin Supreme Court had adopted the discovery rule for all tort cases. *Hansen v. A.H. Robins, Inc.*, 113 Wis.2d 550, 335 N.W.2d 578 (1983).

**20.** Washington's statute of limitations on sexual abuse of a child now states that "all claims or causes of action based on intentional conduct brought by any person for recovery of damages for injury suffered as a result of childhood sexu-

al abuse shall be commenced within three years of the act alleged to have caused the injury or condition, or three years of the time the victim discovered or reasonably should have discovered that the injury or condition was caused by said act, whichever expires later." Wash.Rev. Code ch. 144, S.S.B. No. 6305, amending RCW 4.16.350 and adding a new section to RCW 4.16 (1988).

ing caused their psychological problems. Indiana's discovery rule, on the other hand, has a causality prong, and the rule may be applied when the plaintiff knew about her own injury, but did not know that it had been caused by the act of another. *Barnes*, 476 N.E.2d at 87–88.

This court finds the approach adopted by the Supreme Court of North Dakota to be more persuasive; the nature of incestuous sexual abuse and its concomitant trauma often makes the victim internalize her fear and anger. *See* Comment, Statutes of Limitations in Civil Incest Suits: *Preserving the Victim's Remedy*, 7 Harv. Women's L.J. 189, 198 (1984). Indeed, the most common signs of such trauma—self-blame, low self-esteem, and depression—correspond exactly to the symptoms Susan alleges. This internalization, in turn, prevents a victim from realizing that her psychological problems were caused by the abuse, or by any external event. The proper inquiry, however, is not whether this court finds an approach persuasive, but whether this court thinks the Indiana Supreme Court would find it persuasive.

There are two reasons that this court believes the Indiana Supreme Court would not apply the discovery rule in the present case. First, the rule has only been utilized in the extremely restricted circumstances; both *Covalt* and *Barnes* expressly limited the discovery rule to injuries resulting from protracted exposure to hazardous substances. The Seventh Circuit's invocation of Indiana's discovery rule also involved exposure to a hazardous substance—chromated copper arsenate. *Evenson v. Osmose Wood Preserving, supra.* Furthermore, those cases involved Indiana's statute of limitation for products liability actions. Ind.Code § 33–1–1.5–5. In providing a ten-year statute of limitations for such actions, the Indiana legislature acknowledged the potential for latent injuries which would not be manifest when the actual harm was initially contracted. A similar realization is not evident in the two-year statute for personal injuries. Finally, the fact that the Indiana Supreme Court vacated an appellate court's use of the rule in a personal injury action for concealed

defamation indicates that the Court is not anxious to expand the rule.

Second, it cannot be said that the nature of the injury alleged by Susan is sufficiently analogous to the situations in which the Indiana Supreme Court applied the discovery rule. It is true that her alleged emotional injury can be compared to the latent injuries in the *Covalt* and *Barnes* cases (asbestosis and permanent uterine damage, respectively). The emotional harm sustained from the alleged physical and sexual abuse may initially have been hidden, and have been compounded as time passed and the abuse continued. But in *Covalt* and *Barnes*, the hidden injuries alleged resulted from "seemingly innocent" acts that could not have put the plaintiffs on notice that they may have been injured. *Covalt*, 543 N.E.2d at 385; *Barnes*, 476 N.E.2d at 86. The alleged physical and sexual abuse in the present case were not "seemingly innocent" acts.

Because this court does not believe that the Indiana Supreme Court would extend the discovery rule to cover the present circumstances, this court will not apply that rule. Therefore the plaintiff's cause of action must be governed by the "general rule" that a cause of action accrues when the harm suffered is ascertained or ascertainable.

 The inquiry into when damages are ascertainable is governed by "the nature of the harm for which a plaintiff seeks damages," and how that harm could reasonably have been ascertained. *Burks v. Rushmore*, 534 N.E.2d at 1104. This inquiry, in turn, is governed by the "nature and circumstances" of each case. *Id.* This court must therefore identify the alleged injury and resultant damages to determine when Susan's cause of action accrued. *Monsanto Co. v. Miller*, 455 N.E.2d 392, 394 (Ind.Ct.App.1983). One must be careful, however, to distinguish between the occurrence of damage and the resultant loss:

> For a wrongful act to give rise to a cause of action and thus to commence the running of the statute of limitations, it is not

necessary that the extent of the damage be known or ascertainable but only that damage has occurred. *Shideler v. Dwyer*, 417 N.E.2d at 289. *See also Basinger v. Sullivan*, 540 N.E.2d 91, 93 (Ind.Ct.App.1989); *Butler v. Williams*, 527 N.E.2d 231, 234 (Ind.Ct.App.1988); *Monsanto Co. v. Miller*, 455 N.E.2d 392, 394–95 (Ind.Ct.App.1983). Thus it would not avail Susan to claim that she had known that her father's behavior was psychologically damaging, but had not known the extent or scope of the damage.

■■■■ The question of when a cause of action accrues is generally an issue to be resolved by the jury. *Burks v. Rushmore*, 534 N.E.2d at 1104; *Montgomery v. Crum*, 199 Ind. 660, 161 N.E. 251 (1928); *Babson Bros. Co. v. Tipstar Corp.*, 446 N.E.2d 11, 14 (Ind.Ct.App.1983). When a defendant seeks summary judgment on statute of limitations grounds, "it becomes incumbent upon the plaintiff to present facts raising a genuine issue in avoidance of the statute of limitations." *Nichols v. Amax Coal Co.*, 490 N.E.2d 754, 755 (Ind.1986). If the case goes to trial, the plaintiff bears the burden of proof to establish facts in avoidance of the limitations statute, *id.*, but as the proponent of summary judgment, Dr. Hildebrand must prove "that the action was commenced more than two years after the point in time at which [Susan] could have reasonably ascertained damage" resulting from Dr. Hildebrand's alleged acts. *Burks v. Rushmore*, 534 N.E.2d at 1104. If there are facts sufficient for a jury to decide that Susan sued her father within two years of her injuries becoming ascertainable, summary judgment must be precluded.

■■■ In the present case, the evidence before the court consists of affidavits offered by the plaintiff, the plaintiff's Answers to Interrogatories, and a deposition (offered by the defendant) of the plaintiff by the defendant. Generally, parties cannot thwart the purpose of Rule 56 by creat-

ing issues of fact through affidavits that directly contradict their own deposition testimony. *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1314 n. 3 (7th Cir.1989); *Miller v. A.H. Robins, Inc.*, 766 F.2d 1102, 1104 (7th Cir.1985).[21]

■■■ Dr. Hildebrand argues that Susan's deposition testimony clearly shows that counseling had enabled her to ascertain her psychological damage long before Ms. Hall's diagnosis of post-traumatic stress disorder. He also notes the that Susan has always been aware of her symptoms, and that she has received extensive counseling over the years for these symptoms. The defendant believes that this demonstrates Susan's knowledge of her damage, and that her subsequent connection of the damage to her father's alleged conduct relates only to the extent or scope of the damage rather than to knowledge of the fact of injury. On the other hand, Susan contends that while she knew she was depressed, she did not know that she had been damaged. The nature of the injury, she argues, leads victims to blame themselves for their emotional estrangement, and thus prevents them from ascertaining the damage.

The deposition testimony relied on by the defendant is ambiguous at best. It is true that Susan's testimony often demonstrates that the plaintiff associates her psychological ills to her father:

Q: Why were you depressed in [19]83?

A: The ongoing effects of the childhood.

\* \* \* \* \* \*

A: [Describing her anxieties in 1984, Susan testified that she felt] "this tremendous fear for no reason ..."

Q: Tremendous fear of what?

A: Of what was going to happen next, of what I would do with my life, of everything.

---

21. However, an inconsistent affidavit may defeat summary judgment if "the affiant was confused at the deposition and the affidavit explains those aspects of the deposition testimony or if the affiant lacked access to material facts and the affidavit sets forth newly discovered

evidence." *Miller*, 766 F.2d at 1104. If the court finds that the statements do not directly contradict, it may deny a party's motion to strike. *See, e.g., Reed v. Ford Motor Co.*, 679 F.Supp. 873, 876 (S.D.Ind.1988).

Q: What did that have to do with your father?

A: I think it's directly—it's a direct relationship to the fear that I felt growing up.

\* \* \* \* \* \*

Deposition, pp. 87; 91; *see also* Deposition, pp. 52–55. It is not clear, however, whether Susan associated her depression with her father *at the time* she is referring to in the deposition, or if she is simply projecting a retrospective, current understanding onto her past experience. A jury could easily find this latter possibility plausible. Again, this distinction is relevant for the light it sheds on the ascertainability of Susan's injuries, not because it shows Susan's understanding of a causal nexus between her depression and the alleged abuse.

A party opposing a motion for summary judgment is entitled to have all justifiable inferences drawn in her favor. It is entirely reasonable to infer from Susan's testimony that the understanding of her injuries evidenced in her deposition was a present (1989) knowledge that she was using to interpret her past. This reading prevents Susan's deposition testimony from conflicting directly with her affidavit stating that she did not ascertain her injury until March 9, 1987. Thus the genuinely disputed issue of material fact (the ascertainability of Susan's injuries) was not created by contradictory evidence sponsored by the same party. *Cf. Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861 (7th Cir.1985). This court cannot conclude as a matter of law that Susan ascertained her injuries back in the early 1980's; whether she did or should have ascertained her injuries is a question to be resolved by the jury.

Statutes of limitation cannot be abrogated every time a patient gets a new diagnosis. Nevertheless, a reasonable jury could find that Susan filed suit within two years of her damage becoming ascertainable, given the nature and circumstances of the alleged injury. When dealing with subtle issues of psychological injuries, a court should hesitate to intrude on the factfinding prerogative of the jury. It may well be that a jury will find Susan's claims to be barred, but such a finding is not a foregone conclusion. Because the ascertainability of Susan's injuries is a disputed factual issue, summary judgment must be denied.

■ Alternatively, the plaintiff argues that her father fraudulently concealed from her that she had suffered alegally cognizable injury. Susan alleges that while still a minor, her father diagnosed her depression as stemming from "a chemical imbalance in the brain." [22] She further alleges that she believed Dr. Hildebrand's diagnosis, and that he medicated her with anti-depressants. Indiana Code section 34–1–2–9 provides:

> If any person liable to an action shall conceal the fact from the knowledge of the person entitled thereto, the action may be commenced at any time within the period of limitation after the discovery of the cause of action.

This statute specifically mandates applying the discovery rule in cases of fraudulent concealment. Usually, "the concealment contemplated by I.C. § 34–1–2–9 must be active and intentional." *Lambert v. Stark,* 484 N.E.2d 630, 632 (Ind.Ct.App.1985). The concealment need not be active, however, if the defrauder has "a duty to disclose material information to individuals with whom he has a fiduciary or confidential relationship." *Id.* at 632 (confidential attorney-client relationship); *Basinger v. Sullivan,* 540 N.E.2d 91 (Ind.Ct.App.1989) (attorney-client relationship); *Frady v. Hedgcock,* 497 N.E.2d 620, 622–23 (Ind.Ct. App.1986) (physician-patient relationship). In the present case, there was both a confidential relationship (parent-child) and alleged acts of concealment that were active and intentional.

■ Affirmative acts of concealment must be calculated to mislead and hinder a plaintiff from obtaining information by the use of reasonable diligence, or to prevent inquiry or investigation. *Forth v. Forth,* 409 N.E.2d 641 (Ind.Ct.App.1980). If the defendant's fraudulent conduct involved false representations, the plaintiff

**22.** Plaintiff's Opposition to Defendant's Motion for Summary Judgment, p. 3.

must have alleged reliance on those representations. *Jackson v. Jackson,* 149 Ind. 238, 47 N.E. 963 (1897). Finally, Indiana law requires a plaintiff to have used reasonable diligence to discover the the cause of action. *Miller v. A.H. Robins, Inc.,* 766 F.2d 1102, 1106–07 (7th Cir.1985) (applying Indiana law). Susan's mere assertion that she did not discover her claim until March of 1987, standing alone, would be insufficient to establish a genuine issue of material fact concerning her reasonable diligence. *Hospital Corp. of America v. Hiland,* 547 N.E.2d 869, 875 (Ind.Ct.App.1989).

Susan Hildebrand has alleged facts with respect to these requirements sufficient to avoid summary judgment. Dr. Hildebrand's diagnosis and medication of Susan can reasonably be interpreted as designed to prevent her from understanding or disclosing his alleged abuse of her, or its emotional impact upon her. Susan asserts that she believed her father's diagnosis, and her repeated attempts to deal with her depression through psychological therapy can be seen as a diligent attempt to discover the cause of her woes. Remembering that the discovery rule applies to fraudulent concealment of a cause of action, a reasonable jury could conclude that Susan did not discover her cause of action until March of 1987, and that consequently her suit was not barred by the statute of limitations. *Frady v. Hedgcock,* 497 N.E.2d at 623. Thus the fraudulent concealment statute provides an independent basis for denying summary judgment.[23]

 The plaintiff's final contention—that she was under a legal disability until Ms. Hall diagnosed post-traumatic stress disorder—merits little discussion. As noted above (p. 11, n. 16), persons who under legal disabilities when their cause of action accrued may bring suit within two years after the disability is removed. The Indiana Code defines the phrase "under legal disabilities" to include mentally incompetent persons. Ind.Code § 34–1–67–1(6). "Mentally incompetent," in turn, means "of unsound mind." Ind. Code § 34–1–67–1(3). Although the Indiana Code no longer defines "of unsound mind," the superceded statute defined "of unsound mind" to include "idiots, noncompotes (non compos mentis), lunatics and distracted persons." Ind.Code § 34–1–67–1(3); Acts 1881 (Spec. Sess.), ch. 38, § 857, p. 240; 1973, P.L. 313, § 3; 1982 P.L. 200, § 1.

Ordinarily, unsoundness of mind is a question of fact for the jury to determine. *Collins v. Dunifon,* 163 Ind.App. 201, 323 N.E.2d 264, 269 (1975). In the present case, however, the plaintiff has presented no evidence from which a jury could infer that she was an idiot or lunatic. Furthermore, an Indiana court held, "as a matter of law, that within the meaning of the Indiana statute, a distracted person is a person who by reason of his or her mental state is incapable of managing or procuring the management of his or her ordinary affairs." *Duwe v. Rodgers,* 438 N.E.2d 759, 761 (Ind.Ct.App.1982). With the exception of the period at college when she could not get out of bed because of her depression, there is not enough evidence showing Susan's inability to manage her ordinary affairs to create a genuinely disputed issue of fact.[24] Therefore it cannot be held that Susan labored under a legal disability until the therapy with Ms. Hall helped her shed it.

## CONCLUSION

The court acknowledges that in determining when a cause of action accrues, Indiana's "general rule" and the discovery rule may often yield the same result. This

---

**23.** Conversely, the plaintiff would not prevail under the "continuing wrong" theory, under which the statutory period "commences at the end of the continuing wrongful act." *Ferrell v. Geisler,* 505 N.E.2d 137, 139 (Ind.Ct.App.1987). Even if mailing anti-depressants to Susan in 1984 was considered to be Dr. Hildebrand's last wrongful act, Susan's suit would not have been timely filed.

**24.** Indeed, Susan has been working at the Massachusetts Mutual Life Insurance Company for the past three years, before which she worked for a real estate company, and a mortgage banking company. *See* Interrogatory, pp. 2–3.

fortuity should not obscure the distinctions between the two rules. Perhaps the most important difference is that, under the general rule, the jury will have to make a factual determination concerning the ascertainability of Susan's alleged injuries. This factual dispute will be a crucial issue at trial, and may well be resolved against her, but the ruling on this motion at this time redounds to her favor.

For the reasons stated above, the defendant's Motion for Summary Judgment is DENIED.

It is so ORDERED.